# In the United States Court of Federal Claims

No. 11-268C
(Filed: July 17, 2020)

* * * * * * * * * * * * * * * * * * * *

SECURITYPOINT HOLDINGS, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Motion for reconsideration;
RCFC 59; Implied license;
economic duress

* * * * * * * * * * * * * * * * * * * *

*Bradley C. Graveline*, Chicago, IL, with whom were *Laura M. Burson*, Los Angeles, CA, for plaintiff.

*Gary L. Hausken*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, *Joseph L. Hunt*, Assistant Attorney General, Washington, DC, with whom were *Conrad J. DeWitte, Jr.*, *Lee Perla*, *Carrie E. Rosato*, *Brian N. Gross*, and *Shahar Harel*, for defendant.

## OPINION

On March 16, 2020, we granted in part defendant's motion for summary judgment regarding the existence of an implied license from plaintiff to the Transportation Security Administration for the use of its patented method at those airports at which plaintiff had an agreement with the airport operator. *SecurityPoint Holdings, Inc. v. United States*, 147 Fed. Cl. 499 (2020). We left open the question of the scope of those licenses in terms of the dates and number of lanes at the airports implicated by our finding of an implied license. *Id.* at 503-504.

On April 13, 2020, plaintiff moved for reconsideration, and we set a schedule for briefing. Plaintiff attached a number of documents to its reply

in support of reconsideration, which prompted defendant to file a motion to strike those documents or, in the alternative, for leave to file a sur-reply. Without deciding the propriety of the additional documents, we granted the request to file a sur-reply.  That brief was filed on June 19, 2020, which completed the briefing.  Because plaintiff has not provided a basis on which reconsideration can be granted, we deny the motion.

BACKGROUND

The government's motion for summary judgment argued that plaintiff, SecurityPoint, had granted an implied license to TSA to use the '460 patent's method at airports at which plaintiff had an agreement to provide trays and carts to TSA.  At those airports, SecurityPoint contracts with the airport operators to provide the trays and carts that are used at security screening checkpoints in exchange for the right to sell advertising on those trays.  A portion of the revenue is provided to the operators as an inducement to agree.[1]  This arrangement is with the explicit blessing of TSA, which enters into a memorandum of agreement ("MOU") with the operators, allowing plaintiff to provide the trays and carts for security screening. Defendant thus argues that plaintiff's agreement with the airport operators and plaintiff's knowledge of the intended use by TSA, implies a grant of license to TSA to use plaintiff's method at these airports.

As a separate basis for summary judgment, defendant argued that plaintiff was estopped from arguing otherwise because it had represented to this court and the United States Court of Appeals for the District of Columbia Circuit that TSA operated under an implied license at the airports at which SecurityPoint had an agreement with the operator.  We did not reach that issue.

Despite prior representations to the court that TSA operated under a license at the airports at which SecurityPoint had an agreement, plaintiff

---

[1] Plaintiff also provided an alternative example of an airport at which its arrangement is such that SecurityPoint is the licensee of an license to install and maintain its system at the airport.  Instead of providing a cut of advertising revenue, it pays a license fee per lane if revenue reaches a specific amount.  Plaintiff also pointed out that, at other airports, it was a subcontractor to the airport operator and had direct privity with third parties instead of the airport.  We did not detail these arrangements in our opinion on summary judgment because they would not change the result.

opposed the motion on three principal grounds.  The first was that material questions of fact remained regarding which airports are the subject of the license, the scope of the licenses as to timing and the number of lanes at particular airports, and whether all claims of the patent were licensed.[2]  The second ground of opposition was the argument that, having only entered in these agreements after TSA was already using SecurityPoint's method, no license could have been granted by plaintiff.[3]  Plaintiff also argued that, because the use began before any license, a question remains whether defendant could have relied on SecurityPoint's conduct, an element of an implied license.  *See Endo Pharm. Inc. v. Actavis, Inc.*, 746 F.3d 1371, 1374 (Fed. Cir. 2014).  It further pointed to the fact that TSA changed its MOU with airport operators, which, in its words, "pushed liability to a third party." Pl.'s Opp'n 12.  According to plaintiff, this would have been unnecessary had TSA been relying on anything SecurityPoint did as indicating its ascent to the use.

Third, plaintiff argued that there was a question of fact regarding whether it was coerced into its business agreements at these airports because of the economic consequences of defendant's own unauthorized use of plaintiff's method.  SecurityPoint argued that the facts at trial would show that the licenses were unenforceable as the product of economic duress.  This point, again, hinged on the timing of the airport agreements coming after use by TSA without license.

We agreed with plaintiff that open questions remained as to the scope of the licenses.  Defendant had not established the where and the when of the running of the license, but we otherwise agreed with the government that SecurityPoint's own solicitation of TSA and then airports to supply the trays and carts necessary to carry out its method, implied a license to TSA at those airports.  147 Fed. Cl. at 504.  As to the arguments concerning the legal import of the timing of the agreements, however, we saw no impediment to summary judgment.  We held that a license granted after infringement was not void if the elements were otherwise met, that TSA's decision not to change the existing MOUs undercut plaintiff's argument that TSA had not relied on an implicit grant of authority to use plaintiff's method, and we held that the mere fact that the timing of events created an economic incentive to do what plaintiff did was insufficient as a matter of law to establish economic

---

[2] Plaintiff also argued that the motion was untimely.

[3] Or perhaps, because the license was granted after the other party's use, it was invalid, a distinction without a difference.

duress.  *Id.* at 502-503.  Partial summary judgment was thus appropriate.[4]
Asking for reconsideration, plaintiff argues that those conclusions were
factually and legally infirm.

## DISCUSSION

Plaintiff asks for reconsideration of our holding that the implied
licenses were not the product of duress.  It believes that there are disputed
material questions of fact that read on the issue of whether plaintiff was
coerced into granting the licenses.   SecurityPoint concedes that its
participation in the Bin Advertising Program "could be considered an
implied license" to TSA because it knew that TSA would use them in the
patented manner, but plaintiff argues that any such license was given under
duress.  Pl.'s Mot. for Reconsideration 3. It argues, more explicitly this time,
that the actions of TSA were illegal and in bad faith because it took the patent
without providing compensation, which in turn forced plaintiff to deal with
the airports separately.  Thus, in plaintiff's view, it lost the value of the
patent, at least with respect to the government, and was forced to mitigate by
participating in the Bin Advertising Program; it argues that it had no
alternative but to take the deal left after the government's infringement.
From this it concludes that summary judgment on the issue of economic
duress was inappropriate.

Plaintiff lists four of our factual findings on summary judgment that
it believes are unsupported by the evidence offered.  The first statement
challenged is that plaintiff told TSA that there would be no cost to it.  Plaintiff
asserts that the recitation is "incomplete" or, at a minimum, does not account
for other relevant facts.  It points out that its initial offer to TSA was in
exchange for a nationwide contract to place advertising on the bins that it
supplied.  It further points out that its unsolicited offer to TSA was rejected.
Thus, at no point after TSA began to use SecurityPoint's method, did it ever
offer the materials or method to TSA for free.

Second, plaintiff offers that TSA did not implement the Bin
Advertising Program as a result of plaintiff's offer to provide a nationwide
license in exchange for the exclusive right to place advertisement on the bins.
Instead, plaintiff points to the fact that TSA began using the patented method
as early as September 1, 2005, at Dulles International Airport, and at nine
other airports by the beginning of 2008, all of which occurred prior to the

---

[4] We also held against plaintiff on the issue of timing and whether all the
claims of the patent were covered by any license granted.  *Id.* at 502 (timing),
503-504 (all the claims of the patent were covered).

first MOUs pursuant to the Bin Advertising Program, which came later in 2008.  Thus, the government was not using its method pursuant to a license when it began, even at the airports where it eventually assented to plaintiff's provision of the trays and carts.

Third, plaintiff takes issue with our statement that TSA "eventually took plaintiff up on that offer" when it created the Bin Advertising Program, because TSA's program is not the same as the one plaintiff envisioned: granting TSA a nationwide license in exchange for exclusive advertising rights.  It points out that TSA rejected that proposal and that the arrangement is materially different under the Bin Advertisement Program, mainly because it is not nationwide and because the party with whom plaintiff contracts is not the government.   The result, according to plaintiff, is that it had little to offer the airport operators in its negotiations because TSA was already using SecurityPoint's method.

Fourth, plaintiff avers that there is no evidence that its business model was the same before and after the date of first infringement.  It points again to the fact that it has been forced to deal with the airport operators on a piecemeal basis rather than being able to enter a national deal with TSA. SecurityPoint is also in a worse position than it would have been in a deal with the government because its patent rights are largely of no concern to the airports since TSA is already using the method everywhere.

Defendant responds that plaintiff has presented no basis for reconsideration because it has not shown any new facts not available at the time of the original motion nor an intervening change in the law.  It rejects plaintiff's arguments regarding duress because 28 U.S.C. § 1498 provided plaintiff an alternative to taking the deal that it struck with the airports. Plaintiff could have, and has, sued for compensation under the statute.  It thus had a viable economic alternative and could not have been coerced, argues the government.  Defendant also urges that, as a legitimate exercise of the power of eminent domain, the taking of a license to use the patent's method, prior to compensation being paid, is not an illegal or bad faith action.  Under no set of offered facts could plaintiff show that it was forced by the government's actions, or inaction, to make the deals with the airports, argues defendant.  Further, the agreements alleged to be made under duress are not with the government, points out its counsel, which makes the defense all the more inapposite in defendant's view.  Per defendant, SecurityPoint freely provided the materials to TSA under its agreements with the airports and, in doing so, implied its agreement that TSA could practice the patented method with those trays and carts.

5

In reply to these arguments, plaintiff provides additional background regarding its efforts to solicit TSA with its method and proposal to license it in exchange for an exclusive right to sell advertising. Plaintiff details that it was at the invitation of TSA that plaintiff submitted a white paper to the agency in July 2002. This paper detailed Mr. Ambrefe's invention and proposed that it be used at all 429 national airports. The next month, SecurityPoint followed up with greater detail and a multi-phased plan for deployment of its method across the nation. This was followed in January 2003 by a formal unsolicited offer submitted to TSA. The offer was to provide its method at all national airports in exchange for an exclusive license to place advertising on the trays used and a 5-year contract for operation and maintenance of its system at all the airports. These documents are offered by plaintiff for the first time in support of its reply.

The reply brief then explains that Mr. Ambrefe followed up with TSA over the next two years (2004 and 2005) regarding SecurityPoint's proposal. Those communications are likewise appended to its reply brief. In February 2005, TSA informed Mr. Ambrefe that it had never accepted the unsolicited proposal and had thus never considered it because it did not conform with federal acquisition regulations. The brief goes on to state that, despite that representation, TSA proceeded to test the method to ascertain whether it would work, which eventually culminated in a pilot program at the McGhee Tyson Airport in Tennessee. The success of that program then led to an invitation to plaintiff to test its method at Los Angeles International Airport ("LAX"). Important to plaintiff is the fact that its agreement with TSA to implement that test provided that SecurityPoint would only loan the trays and carts to TSA, not provide them free of charge, as defendant averred in its response brief. Plaintiff attached the MOU from the LAX test to its brief to prove the point.

After success at LAX, rather than enter negotiations with plaintiff, TSA began ramping up an effort to use SecurityPoint's method without its agreement. Plaintiff attaches a 2007 solicitation and separate announcement from TSA seeking vendors for a 1-year test program to provide the trays and carts in exchange for advertising rights. *See* Pl.'s Reply in Support of Mot. for Reconsideration Exs. O, P (ECF No. 479-1). TSA held an "Industry Day" for interested vendors on January 8, 2007, and notified plaintiff only days before the event. Exhibit Q to plaintiff's reply is that notice. A PowerPoint presentation from Industry Day was attached as exhibit R. That presentation instructed vendors to apply to the pilot program and then to enter into agreements with airport operators directly. Plaintiff expressed its concern that it ought not have to bid to provide its own exclusive invention. That letter is also attached as exhibit S to plaintiff's reply.

Details of further attempts by plaintiff to force TSA to respect its patent are laid out in the reply brief. The lack of success of those efforts then lead, according to plaintiff, to a "Hobson's choice" whereby it was left with no recourse but to play by TSA's rules and enter the Bin Advertising Program to compete for the scraps of what it could get to keep its company afloat.

Plaintiff also provides further detail from the Bin Advertising Program MOUs, which it argues made it even harder for SecurityPoint to succeed because the MOUs contained a promise from the airport operators to obtain competing bids for the provision of the trays and carts to TSA. Meanwhile, TSA's checkpoint design guide incorporated and required airports to set up checkpoints to use plaintiff's method. *See* Pl.'s Reply Ex. X.

Plaintiff then switches tack to provide additional factual material and argument regarding TSA's change to those MOUs in 2012 which required airports to indemnify TSA from liability for intellectual property claims relating to the checkpoint equipment, arguing that TSA told operators that it had to make the change due to the lack of license from SecurityPoint. In support, it cites an email string internal to TSA regarding the MOU change, which was submitted along with its motion for reconsideration. Thus, plaintiff argues that a question of fact remains regarding whether TSA could have relied on any conduct by plaintiff since it was internally stating that no license was implied. Lastly, plaintiff's reply points out that it challenged this change at the DC Circuit, representing that a license was implied, but arguing that the circuit court did not rely on that assertion.

Defendant has moved to strike all of the new materials attached to the reply because it is inappropriate to raise new factual matters in a reply brief, especially on reconsideration. Plaintiff responds that the new materials are necessary due to defendant's own new arguments presented in its opposition to reconsideration.

## I. Plaintiff Has Not Presented a Basis for Reconsideration

Reconsideration is proper only "when there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice." *Biery v. United States*, 818 F.3d 704, 71 (Fed. Cir. 2016). Reconsideration is not, however, to be used as an opportunity to relitigate matters already decided or to present new arguments and evidence that could have been raised previously. *See Mathews v. United States*, 73 Fed. Cl. 524, 525-26 (2006). We do not believe that any of the matters raised by plaintiff provide a basis for reconsideration.

We begin with the asserted factual errors.  The fact that plaintiff offered the bins and carts without cost to TSA is undisputed.  Plaintiff now contends that this statement was incomplete because that offer was in exchange for the right to place advertising on those materials, which TSA rejected.  Plaintiff's current arrangements with the airports, or their agents, are not what it contemplated when it made the no cost offer to defendant.  While we agree, we did not hold otherwise.  Although we did not make the context of the no cost offer to the government as explicit as plaintiff does in its motion for reconsideration, no error was made.  Plaintiff's disagreement with how we view the legal significance of its agreements with airports to provide  trays and carts to TSA is not a basis for reconsideration.[5]

Our statement that "TSA eventually took plaintiff up on that offer and created [the Bin Advertising Program] that remains in place today" is likewise not a basis on which to reconsider our opinion.  This was a shorthand way of saying that TSA did implement a program that allows SecurityPoint, or admittedly other offerors, to supply the trays and carts in exchange for the right to place advertising.  Although TSA's implementation of the program inserts the airports as the contracting party with plaintiff, SecurityPoint provides the materials to TSA and receives the right to place advertising thereupon from the airport operators in exchange.  Although our opinion could have been more explicit about the key difference between plaintiff's preferred arrangement—directly with the government—and the eventual Bin Advertising Program—plaintiff contracts with airports—the outcome would have been no different.  Plaintiff has conceded that these circumstances could give rise to an implied license and does not challenge that holding.[6]

Lastly, the statement that plaintiff's business model was the same before and after infringement was not an error.  Although plaintiff argues that there is no evidence in the record to support such a finding, pointing to

---

[5] It is also not clear how, given plaintiff's concession that it is not challenging our finding that a license was implied by its conduct, this additional context would change our holding on duress.

[6] This was the third challenged finding from our opinion.  The second was that TSA implemented the Bin Advertising Program pursuant to plaintiff's proposal.  We made no such finding in our opinion other than the statement just dealt with.  Defendant did not accept plaintiff's proposal, but it did borrow for its Bin Advertising Program the idea that SecurityPoint, and others, would provide the materials for screening in exchange for the right to place advertising at airports.

the fact that SecurityPoint's proposal to TSA was to contract directly with it in exchange for an exclusive nationwide advertising license, it is undisputed that the placement of advertisement on trays and carts remains the heart of plaintiff's business and is its prime generator of revenue. That did not change after infringement. That is what we meant by our statement that plaintiff's "business model was the same before and after the date of first infringement." We were not operating under a misimpression regarding what plaintiff proposed to TSA nor what TSA eventually implemented through the Bin Advertising Program.

We then went on to explain that the mere fact that a license is granted after infringement does not make that license invalid. 147 Fed. Cl. at 503. It is that conclusion that is really at the heart of plaintiff's disagreement with the court. Plaintiff had its chance to persuade us that the timing of the Bin Advertising Program agreements suggests duress and thus the question ought to remain for trial. It was unsuccessful. Absent some change in the law or previously undiscovered evidence, reconsideration of that holding is unavailable.

Further, we agree with defendant that the government's lawful exercise of its power of eminent domain to take a license and use plaintiff's patented method is not evidence of bad faith or coercion. As we explained in *Oasis International Waters, Inc. v. United States*, in order to show that the government coerced the plaintiff, it must establish that the agency's conduct was illegal, a breach of a contract provision without a good-faith basis, or a breach of the implied covenant of good faith and fair dealing. 134 Fed. Cl. 155, 204 (2017). The use of plaintiff's method prior to paying for a license is not illegal because the government, unlike private parties, may exercise its power of eminent domain. *See Leesona Corp. v. United States*, 599 F.2d 958, 966-97 (Ct. Cl. 1979) (*en banc*). 28 U.S.C. § 1498 provides for compensation when the government exercises that right.

The government owed plaintiff no duty to pay it for a license prior to taking one. Payment is owed, but the government's right to use is not conditioned on prepayment. *Crozier v. Fried Krupp Aktiengesellschaft*, 224 U.S. 290, 306 (1912) (interpreting the statutory predecessor to § 1498). The use of plaintiff's method prior to the implied licenses is thus not wrongful or coercive.[7] The fact that plaintiff is owed "reasonable and entire

---

[7] As the Court stated in *Crozier*,

> Indisputably the duty to make compensation does not inflexibly, in the absence of constitutional provisions requiring

compensation" under the statute further removes these circumstances from duress. 28 U.S.C. § 1498(a). Even assuming that economic incentives are sufficient to establish duress, SecurityPoint had a choice. It was not left without a viable alternative to entering the Bin Advertising Program. It could enforce its patent against the United States in the Court of Federal Claims, which it has done. It will not, however, be awarded damages for use at airports during a period when that use was with its own implied consent.[8]

## CONCLUSION

Because plaintiff has not established a basis for reconsideration, the motion (ECF No. 467) is denied.[9] As we held previously, it had a choice whether to participate in the Bin Advertising Program. Its agreement with the airport operators to provide the trays and carts to TSA came with the implication that TSA would use plaintiff's method with plaintiff's blessing. What remains for trial are the questions of which airports are affected, how many lanes at those airports, and when the implied licenses were in effect.


s/ Eric G. Bruggink
ERIC G. BRUIGGINK
Senior Judge


_____

it, exact, first, that compensation should be made previous to the taking,—that is, that the amount should be ascertained and paid in advance of the appropriation,—it being sufficient, having relation to the nature and character of the property taken, that adequate means be provided for a reasonably just and prompt ascertainment and payment of the compensation.

224 U.S. at 306.

[8] Given no reason to reconsider our earlier opinion, we again do not reach the question of whether judicial estoppel should prevent plaintiff from arguing that it did not imply a license to TSA.

[9] Having had no cause to decide whether the materials submitted with plaintiff's reply were untimely, defendant's motion to strike them (ECF No. 482) is denied as moot.